Ryan L. Ford, WSB# 7-4667, rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

*Attorney for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WEIHAI TEXTILE GROUP IMPORT & EXPORT CO., LTD., | ) ) ) | Case No.: 2:21-MC-00147-SWS |
| *Petitioner,* | ) ) | |
| v. | ) ) | |
| ERUPTION HOLDINGS, INC., | ) ) | |
| *Respondent.* | ) | |

## BRIEF IN SUPPORT OF MOTION TO SET ASIDE
## OR REFUSE ARBITRAL AWARD

Eruption Holdings, Inc. (hereinafter referred to as "Eruption"), by and through undersigned counsel, hereby submits its *Brief in Support of Motion to Set Aside or Refuse Arbitral Award*, and in opposition to the *Petition to Confirm an International Arbitral Award* (Doc. No. 1, hereinafter referred to as the "Petition"), as follows:

### SUMMARY OF THE MATTER

Movies desire scripts like this – dreams, aspirations, patriotism, success, betrayal, international mystery, theft and fraud. As in the movies, and our justice system, it is imperative that the "innocent" party prevail. Eruption is that innocent party. Eruption has never entered

into a contract with Petitioner, has never ordered goods or merchandise from China, and has been victimized by the fraud and betrayal of a third-party. Under the governing laws, public policy and the plea of equity and justice, the Petition should be summarily refused.

## FACTUAL BACKGROUND

### A.   ERUPTION'S VISION TO KEEP AMERICA STRONG.

Eruption was originally formed on February 3, 2016. It has now been administratively dissolved by the Wyoming Secretary of State, effective on April 11, 2019. From formation until its dissolution, the principal and mailing addresses of Eruption were associated with Wyoming EZ Corporation. If mail was received by that entity, it was then forwarded to Eruption. **Exhibit A** (hereinafter referred to as the "Legge Affidavit"), attached hereto and incorporated herein by reference, ¶¶ 2-5.

The company was formed by Mr. John Legge (the then-acting Vice President), and his wife, Gwen (the then-acting President). Their mission and purpose was simply patriotic – provide America's military and veterans with men's t-shirts to generate feelings of pride, respect and to encourage both the viewer and the wearer to keep America strong. If that generated any money, their goals were simply to make sure that expenses were covered and then donate to other military service and support efforts. *Id.*, ¶¶ 6-8.

As a veteran of the Air Force, this mission is close to Mr. Legge's heart. These aspirations have been engrained in Mr. Legge, by his father who taught him "If you can think it, you can do it. Never be afraid to think." That mentality is exemplified in Mr. Legge's life-long endeavors, acting as pilot, diver, patent holder, inventor, software engineer, nanotech

developer, and as CEO/CFO of numerous business ventures, including Eruption. *Id.*, ¶¶ 9-10.

In its vision to support America's military, Eruption dedicated itself to duty, honor and strength, creating unique designs to provide active military servicemen, first responders and government agency employees, with appealing and functional apparel that championed the "America Strong" philosophy. *Id.*, ¶ 11.

To accomplish this objective, Eruption partnered with the U.S. Navy Exchange ("NEX"), the Army and Air Force Exchange Service ("AAFES") and GovX (associated with first responders). These organizations strive to provide services and merchandise to America's military personnel in order to make lives more comfortable, regardless of the station location, and to provide support to those who returned home. The need for the merchandise, and the passion to provide the same, was a harmonious wedding of interests. *Id.*, ¶¶ 12-13.

Eruption created several different men's t-shirt designs and submitted them to the respective entities (it did attempt to offer hats and long-sleeve shirts; however, the only items which sold were the t-shirts). From early 2016 through the summer of 2017, Eruption took and filled orders. Each of the orders were placed, manufactured and filled in the United States (all in California, to be exact). As part of keeping "America Strong" it is imperative that design and manufacturing be completed within the states. Additionally, as Eruption was working with governmental entities, it was considered to be a service provider subject to the requirements of the Department of Defense. One of those requirements is that everything be American made. Naturally, Eruption was proud to oblige. *Id.*, ¶¶ 14-18.

In July of 2017, NEX expressed a desire to have reflective ink on the t-shirts in order to provide additional protection and safety for its patrons. However, this was a new step for Eruption and its existing suppliers were not able supply what Eruption needed. *Id.*, ¶¶ 19-20.

Not defeated by the roadblock, Mr. Legge began the long search for an additional provider. This proved to be more difficult than one would expect. After exhausting numerous leads and potential relationships, Mr. Legge was introduced to Francis and Annie Liang, operators of the Feimann Group (hereinafter referred to as "Feimann"), in October of 2017. It was represented that Feimann had the knowledge and capacity to fulfill Eruption's needs. *Id.*, ¶¶ 21-23.

## B. ERUPTION'S NEW VISION COMES TO FRUITION.

On May 21, 2018, NEX issued a purchase order to Eruption, under Eruption's Department of Defense vender number 079202411. Eruption considered this moment a tremendous success and the beginning of something bigger than it had originally contemplated. *Id.*, ¶¶ 24-25.

To fulfill this demand, Eruption issued its first and only purchase order to Feimann, on March 21, 2018, for four designs of Eruption's veteran style brand t-shirts. The purchase order was completed on April 30, 2018, and the final products were accepted by Eruption. For these efforts, Feimann was compensated by Eruption in the amount of $3,432.00 (under invoice #FMG18025) on May 14, 2018. This was the only purchase order that was agreed upon between Eruption and Feimann. *Id.*, ¶¶ 26-28.

Shortly thereafter, due to the politics between AAFES, GovX and NEX (which are competing entities), the red tape associated with governmental agencies, and the low margins associated with t-shirt sales, Eruption came to the realization that its business life was quickly coming to a close. *Id.*, ¶ 29.

In the mid-summer of 2018, Eruption filled its final order with GovX. Eruption was non-operational after August of 2018, and made no further orders. Realizing its run was over, Eruption closed its bank account on November 25, 2019. *Id.*, ¶¶ 30-32.

## C.   FORGERY AND FRAUD.

On August 28, 2018, Eruption was asked by Mr. Liang to assist Feimann with its manufacturer relationships by wiring $300.00 to Weihai Textile Group, Inc. (hereinafter referred to as "Weihai"). Mr. Liang explained that he and/or Feimann would wire $350.00 to Eruption (with the extra $50.00 being provided to cover wiring expenses). Once Eruption received the wire, it was to wire the amount of $300.00 to Weihai. *Id.*, ¶ 33.

The request seemed innocent enough. Looking forward to assisting a perceived partner in need, on August 29, 2018, Eruption acted as requested. From the pleadings presented in this matter, it appears that Weihai acknowledges receipt of this amount. *Id.*, ¶¶ 34-35.

After that date, Eruption had no dealings with Feimann or Mr. Liang. Surprisingly, nearly one year later, in mid-2019, Eruption received correspondence from Brown and Joseph, LLC. Purporting to investigate the matter on behalf of China Export & Credit Insurance Corporation ("Sinosure") for its insured Weihai, Brown and Joseph claimed Eruption owed over $577,000 to Weihai. Ironically, the correspondence was delivered to Mr. Legge at his

home address of 6139 E. Allison Circle; Orange, CA 92869 – it was not sent to Eruption's address. Upon receipt of this correspondence, Mr. Legge contacted the sender, disputed the alleged debt, and discussed the allegations. In January of 2020, Mr. Legge provided additional, written, responses to Brown and Joseph. Communications ceased and Mr. Legge considered the matter addressed. *Id.*, ¶¶ 36-40.

This chain of events was incredulous news to Eruption, as it had never ordered products or goods from a Chinese company (due to the specification requirements set forth by the governmental agencies and due to personal preference to keep everything in America) and it had never dealt with purchase orders of that magnitude. *Id.*, ¶ 41.

Acting swiftly, Eruption investigated the matter. During that investigation, it discovered that on December 12, 2018, correspondence was sent to Weihai, upon what appears to be Eruption letterhead and bearing the alleged signature of Mr. Legge (hereinafter referred to as the "Letter"). Within the Letter, it is represented as follows:

> I John Legge, hereby give authorization to Mr. Francis Liang, to act on my behalf, representing Eruption Holdings, Inc., in dealing of Apparel Business with China. This Authorization letter also authorizes Feimann Group, Inc., a California registered corporation to act as the handling agent for Eruption Holdings, Inc. in regard to all logistics, warehousing and payment matters.

*Id.*, ¶ 42.

Upon receipt of the Letter, Mr. Legge immediately recognized the same to be utterly false and the signature a blatant forgery. For starters, neither Eruption nor Mr. Legge authorized Mr. Liang or Feimann to act on their behalf. Mr. Liang was never considered as an authorized agent, an employee, an affiliate or a shareholder of Eruption. *Id.*, ¶¶ 43-44.

Additionally, Eruption had no business dealings in China – its only connection to Weihai was that of assisting Mr. Liang with the requested wire transfer. Here, it became imminently apparent that Mr. Liang had defrauded Eruption utilizing Mr. Legge's and Eruption's names – names that stood for American pride and resilience were now being drug through the mud and exploited. *Id.*, ¶¶ 45-46.

After obtaining the Letter, on May 23, 2019, Mr. Legge filled out a report to the Federal Trade Commission (FTC), (report # 107575736) reporting this matter. *Id.*, ¶ 47. In addition, more recently, Mr. Legge has filed a report with the Orange County Police Department in the City of Orange, through Officer J. Hunt, on July 7, 2021, reciting the alleged fraud and identity theft perpetuated by Mr. Liang. Report #21-07-0704 displays the crime type as PC 470 [Forgery] and has been assigned to Detective George. *Id.*, ¶ 48.

To further support this claim of forgery and fraud, Mr. Legge recently retained a handwriting expert to opine on the signature as found upon the Letter. Per the opinion of Ms. Carlson, when comparing the signature of the Letter to the real signatures of Mr. Legge, it is readily apparent Mr. Legge was not the signer. *Id.*, ¶ 49.

Mr. Liang has been busy. In reviewing additional files, Mr. Legge also came across a July 25, 2018, letter on Eruption letterhead and signed by Liang. The recipient is unknown – but assuredly this has been provided to numerous Chinese manufacturers. This correspondence allegedly appoints Mr. Liu, Yun (York Liu) as Eruption's representative in China. Eruption is entirely unfamiliar with this individual. Based upon this correspondence

and other demands received from Brown and Joseph, Eruption is fretful this will not be the first attempt to collect funds from Eruption. *Id.*, ¶¶ 50-51.

Curiously, yet another letter was provided by Brown & Joseph. This correspondence, apparently from Sinosure, purports to assign the $577,000 debt collections efforts to Brown & Joseph. Assuming this is a valid document, it stands to reason Weihai was compensated from its insurer who, in turn, sought to collect through Brown & Joseph. Consequently, it is entirely possible the arbitral award constitutes a windfall for Weihai. *Id.*, ¶¶ 52-53.

### D.  ERUPTION WAS UNAWARE OF THE ARBITRATION.

While Eruption was aware that allegations were being made against it due to the received correspondence, Eruption was **not** aware of any arbitration proceedings. Indeed, only upon service of the Petition (Doc. No. 1) was Eruption made aware that a proceeding was held and an award was granted. *Id.*, ¶ 54.

Via the Petition, it is clear that Weihai, through the arbitrator, claims on May 6, 2020, an arbitration notice, copy of the Arbitration Rules and Panel of Arbitrators was mailed, via express mail service, to Eruption. *Id.*, ¶ 55.

Likewise, Weihai, via the arbitrator, claims that the arbitration court mailed the arbitration application and the evidence to Eruption. It is alleged that those mailings were confirmed and delivered on July 14, 2020. However, Eruption has never received these alleged mailings. *Id.*, ¶ 56.

Similarly, Petitioner, via the arbitrator, claims that on September 24, 2020, a signed declaration and a notice of hearing was provided to Eruption. This mailing has a purported

delivery date of September 30, 2020. As before, Eruption has never received this alleged mailing. *Id.*, ¶ 57.

Finally, the Petition, via the arbitrator, claims that on November 30, 2020, the arbitration court forwarded the "List of Documents Submitted by the Claimant" to Eruption. This mailing has a purported delivery date of December 7, 2020. As before, Eruption has never received this alleged mailing. *Id.*, ¶ 58.

Each of these shortfalls appear to fly in the face of the claims of the arbitration court (and, as a result, the claims of Weihai) that "All arbitration documents in relation to the Case have been served to the Claimant and the Respondent according to Article 8 of the Arbitration Rules." This failure is even more apparent when a representative of Weihai was able to contact Mr. Legge, at his personal residence, in 2019. *Id.*, ¶¶ 59-60.

As a final check, on July 16, 2021, Mr. Legge confirmed with Wyoming EZ Corp, that no mailings, legal papers, or any other correspondence on this matter, were received by virtue of Wyoming EZ Corporation acting as its Registered Agent in Wyoming. *Id.*, ¶ 61.

1603 Capital Avenue; Suite 314; Cheyenne, Wyoming 82001, was the commonly utilized address for Eruption. This was also the mailing address for Wyoming EZ Corporation – all deliveries to that address are forwarded to Mr. Legge at his home. No mailings or deliveries were received. *Id.*, ¶ 62-63.

Investigating the matter even further, the only provided tracking number in the Petition suggests that the alleged mailing has not been delivered in the United States, if delivered at all. Eruption has attempted to follow this tracking number through a variety of website tracking

applications. Only two outcomes are realized – either the package does not exist, or it is awaiting delivery. *Id.*, ¶¶ 64-65.

Based upon this discovery, it stands to reason that no correspondence was ever delivered to or received by Eruption. The failure of the arbitral court to provide sufficient notice to Eruption deprived it of the due process associated with presenting the merits of its case at the arbitration hearing. *Id.*, ¶¶ 66-67.

E.    **ERUPTION'S FURTHER REVIEW OF THE PETITION.**

Throughout Exhibit 1 of the Petition, Eruption notes several factual matters or allegations which do not match with Eruption's operations. First and foremost, Eruption has never ordered goods or merchandise in the volume or monetary value presented. Nor has Eruption ordered from China. Indeed, Eruption could not order from China due to the Department of Defense requirements. *Id.*, ¶¶ 68-70.

All of the purchase orders with Weihai appear to be signed by Mr. Liang, allegedly as the manager of Eruption. However, Mr. Liang had no authority to act on behalf of Eruption. Mr. Liang was never an employee, shareholder, agent or other representative of Eruption. Any allegations of authority are based purely on fraud. *Id.*, ¶¶ 71-73.

The items ordered generally do not fall within Eruption's business model. Eruption was in the sole business of men's t-shirts (it did attempt to offer hats and long-sleeve shirts; however, the only items which sold were the t-shirts). Eruption was never in the business of procuring or selling ladies pants, ladies jackets, batwing tees, hoodies, pants of any nature or

shorts. However, these are precisely the items as ordered from Weihai by Mr. Liang. (See Doc. 1, Pgs. 82-103). *Id.*, ¶¶ 74-76.

In addition, these orders account for the procurement of approximately 77,600 individual pieces of merchandise. Eruption never made an order of that magnitude. During Eruption's lifetime, at most, only 10,000 t-shirts were sold. There was no need or demand for Eruption to support the drastic order volumes presented in this matter. This is particularly true given the fact that, at the time the Weihai orders were placed, Eruption's doors were closed for business. *Id.*, ¶¶ 77-81.

Finally, it should be noted that Eruption has **never** received the goods or merchandise allegedly provided by Weihai. It appears Feimann and/or Mr. Liang have absconded with the goods and these two parties are left to sort through the mess – leaving Eruption with the task of attempting to clear its name for a breach of contract it was not a party to and did not commit. *Id.*, ¶¶ 82-83.

In short, Eruption did not (i) enter into a contract with Weihai, (ii) order the goods or merchandise or (iii) authorize Mr. Liang to act on its behalf. It is apparent Mr. Liang and/or Feimann willfully and ill heartedly induced Eruption and Mr. Legge to open the door to Weihai via a $300 wire transfer. Now, both have fallen victim to the fraudulent actions of Mr. Liang. *Id.*, ¶¶ 84-85.

Based on the fact that the Letter was provided to Weihai months after the first order was submitted by Mr. Liang, it stands to reason that Weihai began to question the validity of the numerous transactions (and likely the lack of payment) as well. This is particularly true

when one considers that, other than the $300, all payments to Weihai were issued by Feimann, not by Eruption (See Petition, pg. 29). *Id.*, ¶¶ 86-87.

Eruption has never conducted business in China and has never authorized Mr. Liang to act on its behalf. *Id.*, ¶ 88.

## GOVERNING LAW

9 U.S.C.A. § 207 of the Federal Arbitration Act (hereinafter referred to as the "FAA") expressly provides, in pertinent part, that:

> The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in said Convention.

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. 9 U.S.C.A. § 202; see also *Invista N. Am., S.%22a.r.l. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 200 (D.D.C. 2007).

Article V of the New York Convention enumerates the limited grounds upon which a court may refuse to enforce a foreign award. The burden of proof is on the party asserting these defenses. The defenses include, but are not limited to, the following relevant matters:

- The agreement is not valid under the law to which the parties have subjected it or the law of the country where the award was made.

- A party against whom an award was rendered was not given proper notice of the appointment of the arbitrator, or of the arbitration proceeding.

- The recognition or enforcement of the award would be contrary to the public policy of that country.

Courts have also recognized "a handful of judicially created reasons" that a district may rely upon to vacate an arbitration award, and these include violations of public policy, manifest disregard of the law, and denial of a fundamentally fair hearing. *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001). Courts construe these defenses "narrowly, to encourage the recognition and enforcement of commercial arbitration agreements in international contracts." See *Karaha Bodas Co. v. Perusahaan*, 364 F.3d 274, 288 (5th Cir. 2004).

If a party opposes entry of the arbitral award against it, it must either initiate an action to set aside the arbitral award or respond to the winning side's action to enforce the award with a motion to set aside or refuse. *Id.*, and 9 U.S.C.A. §§9-11.

## STANDARD OF REVIEW

In reviewing a district court's decision regarding confirmation of an arbitration award, appellate courts review legal questions *de novo* and factual findings for clear error. An error is clear if the district court's findings lack factual support in the record or if, after reviewing all the evidence, there definite and firm conviction that the district court erred.

Appellate courts do not owe deference to the district court's legal conclusions, but afford maximum deference to the arbitrators' decisions. The standard of review of arbitral awards is among the narrowest known to the law. There is no authorization to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or

on misinterpretation of the contract. *CEEG (Shanghai) Solar Sci. & Tech. Co., Ltd v. LUMOS LLC*, 829 F.3d 1201, 1205 (10th Cir. 2016)(internal citations and quotations omitted).

## ARGUMENT

Petitioner's request to the Court falls short on multiple levels and should be summarily refused. Even before addressing the arbitration proceedings themselves, the assignment of the alleged debt from Sinosure to Brown & Joseph seems to imply that Weihai is not a proper party to these proceedings.

The only reason for an insurer to initiate collection efforts is if it paid a claim made by its insured (Weihai). It stands to reason that Brown & Joseph, upon Eruption's dispute of the debt and evidencing the fraud, ceased its collections. Now Sinosure and/or Weihai are attempting a work-around via the arbitral proceedings. That attempt should be halted. This is particularly true as the arbitral award does not arise out of a legal relationship between the parties.

### A. THE ARBITRATION AGREEMENT AND THE ENSUING ARBITRAL AWARD DO NOT ARISE OUT OF A LEGAL RELATIONSHIP.

Petitioner claims "The Award at issue was the final result of a commercial contract dispute." If one was sitting in the chair of Weihai, it is easy to see how such a claim would be asserted. However, given the evidence presented herein, this claim could not be more off-base. There was no legal relationship, contractual or otherwise, between the parties.

During the drafting of the FAA, two reservations were included in order to assure accession by a substantial number of nations. The most applicable to this matter is the second,

which provides "the Convention will apply only to differences arising out of legal relationships 'considered as commercial under the national law' of the state declaring such a reservation." *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983).

The reservations were written into 9 U.S.C.A. § 202 – *Agreement or award falling under the Convention*, expressly stating, in pertinent part, as follows:

> An arbitration agreement or arbitral award **arising out of a legal relationship**, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention…

i.     **There is no contractual relationship between the parties.**

Undisputedly, each of the contracts relied on by Weihai were executed by Mr. Liang (Petitioner actually refers to Feimann as Eruption's "agent"; see Petition, Pg. 4, ¶ 10) during August, October, November and December of 2018. During this time, Eruption was non-operational. Even if Eruption was operating, it was prohibited from procuring its merchandise from a Chinese manufacturer. The existence of a contractual relationship between Eruption and Weihai is not plausible.

The elements of a contract are offer, acceptance, and consideration. *SH v. Campbell Cty. Sch. Dist.*, 2018 WY 11, ¶ 6, 409 P.3d 1231, 1233 (Wyo. 2018). Flowing therefrom, the elements for a breach of contract claim consist of a **lawfully enforceable contract**, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages. *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), as amended on reh'g (Feb. 7, 2012) (emphasis supplied).

While the elements for a breach of contract come close to the mark, both of these well-established principals make one simple assumption – that there are at least two parties to the agreement. As the United States Supreme Court has repeatedly emphasized, arbitration is simply a matter of contract and consent. *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).

After all, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018) (citation and quotation omitted). It is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock*, 561 U.S. at 296–97. Whether a contract exists is determined by state-law contract principles. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016).

Here, undoubtedly someone agreed to Weihai's contracts (we now know that to be Mr. Liang), but it was not Eruption. Eruption has never engaged or sought the services of Petitioner (or any Chinese company for that matter). In fact, during the time period in question, Eruption's doors were closed for business. Likely realizing this, and seeing the opportunity for his own financial gain, Mr. Liang took it upon himself to act and provided Weihai with the Letter, holding himself out as an authorized agent of Eruption in "dealing of Apparel Business in China."

As demonstrated earlier (see Legge Affidavit, Exhibit 15), the Letter is a forgery and constitutes fraud under the law. Mr. Liang was never an employee, a general manager, a "GM", a shareholder or an authorized agent of Eruption. Consequently, Eruption presented no offer,

Eruption received no consideration and there is no lawfully enforceable contract. Without a lawfully enforceable contract, the arbitral court has no jurisdiction and the "arbitral award" is a fiction. Consequently, there is no legal relationship and Weihai's claims fail. Weihai needs to locate Mr. Liang for its sought-after relief.

## ii.    There is no other legal relationship between the parties.

9 U.S.C.A. § 202 implies that the relationship between the parties is not strictly limited to contractual dealings. Yet, little information is available as to the definition of a "legal relationship between the parties." Even without that assistance, it is evident no legal relationship existed.

"Legal Relation" is defined by Black's Law Dictionary as "The connection between one person or entity and another; *vinculum juris*." In turn, "*Vinculum Juris*" is "a bond of the law...The tie that legally binds one person to another; legal bond; obligation." Having already addressed the lack of a contractual relationship, one would naturally look to other relationships or duties that may be owed in tort or equity. Here, none exist.

Other than (i) an innocent and, to be frank, unaware, wire transfer of $300.00 and (ii) a casual and catastrophic connection with Mr. Liang, Eruption has no connection to Weihai. Eruption submitted no order and it received no product. Eruption never spoke to Weihai and at no time did it authorize anyone to speak with Weihai on its behalf.

The Petition itself resounds with instances of Weihai communicating with Mr. Liang. (See Petition, pgs. 23, 24, and 26). Notably missing from these allegations are communications with Eruption. Everything began and ended with Mr. Liang.

Assuming, *arguendo*, that Weihai is able to prove some relationship between the parties, Wyoming has long recognized the principle "fraud vitiates everything." *In re Hartt's Est.*, 75 Wyo. 305, 330, 295 P.2d 985, 990 (1956). Likewise, in the 10th Circuit, protection is given to one who is injured by falsehood or deception; fraud vitiates everything which it touches and destroys the very thing which it was devised to support; the law does not temporize with trickery or duplicity. *King v. Horizon Corp.*, 701 F.2d 1313, 1318 (10th Cir. 1983).

As there is no legal relationship between the parties, the Petition fails to pass the first hurdle of 9 U.S.C.A. § 202, and it should be summarily refused.

**B.     ERUPTION WAS NOT PROVIDED WITH AN OPPORTUNITY TO PARTICIPATE IN THE ARBITRATION.**

According to Exhibit 1 of the Petition, no less than four separate notices or mailings were submitted to Eruption. As of the date of this pleading, not a single one was ever delivered.

**i.     Eruption was prejudiced due to lack of notice.**

To judge compliance with the New York Convention's "proper notice" requirement, courts look to the forum's standards of due process. *See Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Basic due process requires this much.

While the Petition is replete of allegations of notices mailed to Eruption, the only tracking number provided is that of the mailing of the final arbitration award. Even that mailing has yet to arrive in Eruption's mail-box or at Mr. Legge's personal address.

Certainly, had the notices been delivered, both the arbitral court and Weihai would have received the delivery confirmations and incorporated them within the Petition itself. Here, there is nothing more than confirmation that the very last mailing was delivered in Beijing, China. No evidence is present that Eruption received notice of the pending arbitration. As a result, it suffered irreparable prejudice as it was not able to present the merits of its case, and thus deprived of due process.

Even more troublesome is the fact that an agent of Weihai contacted Mr. Legge, at his personal residence, nearly a year before the arbitration proceedings took place. Certainly, Weihai knew how to contact Mr. Legge and/or Eruption; there is no indication that other reasonable efforts were taken to make contact.

While it is recognized that maximum deference is provided to the arbitrator's decision, it is difficult to presume that any arbitral court, regardless of the jurisdiction, would have simply disregarded the factual evidence of forgery and fraud in this matter. Without having that information in hand, as well as understanding the restrictions, Eruption was working under, it is easy to comprehend why the arbitral court issued its award. Unfortunately, due to the faulty and/or undelivered notices, Eruption's due process rights were eviscerated as it was unable to present its compelling case at the arbitration hearing. Thankfully, the New York Convention and case law provide defenses for innocent parties, like Eruption, to obtain justice.

As one district court aptly articulated, "[t]hese awards do not result from legitimate arbitrations **where all the parties to the arbitration participate**, and they do not stem from any contractual agreement to arbitrate between parties ... [i]nstead, these awards are mere pieces of paper paid for by borrowers that have no legal effect." *Decormier v. Nationstar Servicers, LLC*, No. 12-CV-00062, 2020 WL 5257737, at *2 (E.D. Cal. Sept. 3, 2020) *report and recommendation adopted in part, rejected in part*, 2020 WL 5989180 (E.D. Cal. Oct. 9, 2020) (report and recommendation rejected on other grounds)(emphasis added).

ii.     **The Court should refuse the award due to procedural unfairness.**

The Tenth Circuit in *Bowles Fin. Grp. v. Stifel*, 22 F.3d 1010 (10th Cir. 1994), addressed whether an arbitration should be set aside because of a lack of procedural fairness. In the court's review, it stated:

> Federal courts have never limited their scope of review [of an arbitration award] to a strict reading of [9 U.S.C.A. 10]. Courts have created a basic requirement that an arbitrator must grant the parties a fundamentally fair hearing, expressing the requirement in various forms (if the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact).

*Id.* at 1012-13 (internal citations and quotes omitted). Citing the Eleventh Circuit, the court in *Bowles* went on to say:

> The courts seem to agree that a fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias.

The court in *Bowles* ultimately found that the arbitration proceeding was not fundamentally unfair, and was agreed upon by the defendant when it entered into the bargain. The essence of the court's opinion was that the parties agreed to the arbitration.

The situation with Eruption is entirely different. Eruption did not receive a fundamentally fair hearing, because it was not a party to the agreement, nor did it receive any notice of the proceedings, nor did it have any input in any hearing process. The arbitration was conducted with no notice and, even if notice was to be found, without any input or participation by Eruption. Simply put, Eruption did not bargain for this, because it did not sign anything bargaining for it.

No notice was provided. While it is alleged that mailings were submitted, it is certainly difficult to rely upon a delivery confirmation that states the package remains in Beijing. With that information, the efforts to provide notice were not reasonably calculated, under all of the circumstances, to apprise Eruption of anything. Pursuant to Article V of the New York Convention, the Petition should be summarily refused.

## C.   EQUITY, JUSTICE AND PUBLIC POLICY DEMAND THAT THE PETITION BE DENIED.

Equity, justice and public policy dictate that an innocent party should not be punished for the flagrant, willful and fraudulent deed of another. Weihai requests that the Court disregard that policy. Such a request flies in the face of both federal and Wyoming law. Article V of the New York Convention provides the Court with an avenue to thwart Weihai's Petition as it is contrary to the public policy of America and of Wyoming.

The general rule for this matter is simple - the law should not aid in the carrying out of a fraud. *Baylies v. Vanden Boom*, 40 Wyo. 411, 278 P. 551, 556 (1929), see also, *Fox v. Tanner*, 2004 WY 157, ¶ 19, 101 P.3d 939, 944 (Wyo. 2004). Wyoming courts have long acknowledged the basic rule of law that fraud vitiates everything. *Nat'l Ass'n of Credit Men, Montana-Wyoming Unit v. Moss*, 349 P.2d 202, 209 (Wyo. 1960), see also, *Kendrick v. Barker*, 2001 WY 2, ¶ 18, 15 P.3d 734, 740 (Wyo. 2001). To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law. *Snyder v. Lovercheck*, 992 P.2d 1079, 1086 (Wyo. 1999).

Here, the Court has the opportunity to rely on *Sheldon* and apply "a handful of judicially created reasons" to vacate the arbitral award due to the violations of public policy and manifest disregard of the law. Indeed, Mr. Liang perfected a fraud against the parties and both have now suffered losses due to those actions. The ultimate result of that fraud is the issuance of the arbitral award against Eruption. The avalanche of consequences should not simply be divided or imposed amongst litigants, causing even more destruction and loss along the way.

Pursuant to Article V of the New York Convention, and 10th Circuit case law, the Court has the authority and the opportunity to halt this injustice in its tracks. The Petition should be summarily refused and Weihai should look to receive its justice from Mr. Liang – if possible, Mr. Legge will gladly assist in those efforts.

## CONCLUSION

This matter optimizes the phrase "May no good deed go unpunished." Indeed, it is punishment enough that a well-intended business venture falter. However, to then be required to defend against allegations arising from the willful, wanton and fraudulent actions of a third-party is incomprehensible. Eruption has been punished enough. It was not a party to the alleged contracts, it received no notice of the arbitration proceedings, it did not receive the goods, and it was exploited by a business acquaintance. Under the governing laws, public policy, and the plea of equity and justice, the Petition should be summarily refused.

**RESPECTFULLY SUBMITTED this 6th day of August, 2021.**

ERUPTION HOLDINGS, INC.,
a Wyoming Corporation,

*Plaintiff.*

By: ___/s/ Ryan L. Ford___
Ryan L. Ford, WSB# 7-4667
          rford@wpdn.net
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
PO Box 10700
Casper, WY 82602
(307) 265-0700
(307) 266-2306 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August, 2021, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to counsel as follows:

**Bradley T Cave**
HOLLAND & HART
bcave@hollandhart.com

**Yan Ge** (*pro hac vice*)
**Michael Amberg** (*pro hac vice*)
**Wenfeng Su** (*pro hac vice*)
KING & WOOD MALLESONS
geyan@us.kwm.com
michael.amberg@us.kwm.com
wenfeng.su@us.kwm.com

**Bing Cheng** (*pro hac vice*)
KING & WOOD MALLESONS
chengbing@cn.kwm.com

By: ____/s/ Ryan L. Ford____
Ryan L. Ford, WSB# 7-4667