

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

---

WEIHAI TEXTILE GROUP IMPORT &
EXPORT CO., LTD.,

      Petitioner,

   v.

ERUPTION HOLDINGS, INC.,

      Respondent.

Case No. 21-MC-147-SWS

---

## ORDER CONFIRMING ARBITRAL AWARD

---

Petitioner Weihai Textile Group is a Chinese company that imports and exports clothing and textiles.  Respondent Eruption Holdings is a Wyoming corporation, formed in February 2016 and administratively dissolved in April 2019, that sold men's t-shirts to U.S. military members and veterans.  Weihai says it entered into a total of seven sales contracts with Eruption over several months in late 2018 to supply Eruption with over half a million dollars' worth of various garments.  When Weihai wasn't paid for the last six sales contracts, it took the dispute before a trade arbitration commission in China (CIETAC) pursuant to an arbitration clause in each of the sales contracts.  The arbitrator awarded Weihai over $566,000 on the six unpaid sales contracts after Eruption failed to appear for the arbitration.

Weihai filed the instant action in U.S. federal court for an order confirming the international arbitral award in order to enforce it against Eruption.  (Doc. 1.)  Meanwhile,

Eruption has moved to have the arbitral award set aside or refused, arguing it never entered into the sales contracts which were the result of fraudulent conduct by a third party, it never had proper notice of the arbitration proceeding, and equity and public policy demand the arbitral award be set aside or refused. (Docs. 11, 12, 33.)

At Weihai's request (Docs. 17, 20) and over Eruption's objection (Doc. 19), the Court granted Weihai leave to engage in limited discovery on the issues presented by Eruption in this proceeding (Doc. 21). The discovery period has concluded, and the parties have fully briefed the issues. (Docs. 32, 33.) Whether the foreign arbitration award should be confirmed or refused is now ripe for decision.

## BACKGROUND

Eruption was formed in 2016 by Mr. John Legge and his wife, Gwen, with the purpose of providing patriotic men's t-shirts to U.S. military members and veterans. (Legge Aff. (Doc. 12-1) p. 2.) In 2017, Eruption desired to produce t-shirts with reflective ink. (*Id.* p. 3.) In late 2017, Mr. Legge was introduced to Mr. Francis Liang and his wife, Annie, who were operators of the Feimann Group, who could fulfill the reflective ink requirement. (*Id.* pp. 3-4.) In early 2018, Eruption purchased a relatively small order of t-shirts with reflective ink from Feimann Group at a cost of about $3,400, which was Eruption's only purchase from Feimann Group. (*Id.* p. 4.) Eruption was non-operational after August 2018. (*Id.* pp. 4-5.)

That was not the end of Eruption's interaction with Francis Liang and the Feimann Group, though. Francis Liang contacted Mr. Legge in late August 2018 for a supposed favor.

> Eruption was asked by Mr. Liang to assist Feimann with its manufacturer relationships by wiring $300.00 to Weihai[.]  Mr. Liang explained that he and/or Feimann would wire $350.00 to Eruption (with the extra $50.00 being provided to cover wiring expenses).  Once Eruption received the wire, it was to wire the amount of $300.00 to Weihai.

(*Id.* p. 5.)  Eruption complied because "[t]he request seemed innocent enough" and Mr. Legge wanted to help "a perceived partner in need[.]"  (*Id.*)  Eruption says it had no further contact with Francis Liang or the Feimann Group.  (*Id.*)

Francis Liang, allegedly working on behalf of Eruption, entered into a total of seven sales contracts with Weihai for the purchase of a large number of garments, with the first contract dated August 1, 2018, the next three dated October 12, 2018, the next two dated November 11, 2018, and the last dated December 11, 2018.  (Doc. 1 pp. 26-27.)  Between the $300.00 that was wired by Eruption and later payments from the Feimann Group allegedly acting on Eruption's behalf, the first contract was paid in full, and the second contract was partially paid.  (*Id.*)  Weihai shipped the garments to Los Angeles as designated in the sales contracts.  (*Id.* pp. 27-28.)  The remaining balance of over $566,000 was never paid by either Francis Liang/Feimann Group or Eruption.  Pursuant to an arbitration clause in the sales contracts, Weihai pursued the unpaid balance in arbitration and received the foreign arbitral award at issue in this case.

Eruption sets forth three reasons enforcement of the arbitral award should be set aside or refused.  First, it contends it was not a party to the sales contracts because Francis Liang fraudulently entered into the sales contracts on Eruption's behalf without ever having the authority to do so, and Eruption never received any of the merchandise.  Second, Eruption says it never received notice of the arbitration proceeding in China and it would

have defended itself in that forum if it knew about the proceeding.  And third, Eruption argues equity, justice, and public policy demand the arbitral award be refused so it is not wrongfully held to answer for Francis Liang's fraud.  Weihai stands fast in its request to confirm the foreign arbitral award.  (Doc. 32.)

## STANDARD OF REVIEW FOR ENFORCING OR REFUSING FOREIGN ARBITRAL AWARDS

Weihai seeks to confirm and enforce the Chinese arbitral award under the 1958 U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the "New York Convention." (Doc. 1 p. 2.)  "The New York Convention is a multilateral treaty that addresses international arbitration." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020).  As relevant here, "the New York Convention applies to arbitral awards 'made' in a foreign country that a party seeks to enforce in the United States (known as foreign arbitral awards)[.]" *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70 (2d Cir. 2017).  Chapter Two of the Federal Arbitration Act (FAA) incorporates the provisions of the New York Convention into United States domestic law. *See* 9 U.S.C. §§ 201–208.  Both China, where Weihai is based, and the United States, where Eruption is based, are signatories to the New York Convention.

The Court first notes it does not have the authority to "set aside" the arbitral award, as requested by Eruption.  The arbitral award at issue here was made in China applying Chinese law pursuant to sales contracts that expressly made China the forum nation for arbitration.  (*See, e.g.*, Doc. 1 p. 84.)  Therefore, only China holds "primary jurisdiction"

over the arbitral award under which the award can be set aside or modified. *CBF Industria de Gusa S/A*, 850 F.3d at 71. In contrast, this Court sits in "secondary jurisdiction" over the foreign arbitral award, "in which parties can only contest whether [the United States] should enforce the arbitral award." *Id.* (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007)). Thus, as a secondary jurisdiction, this Court's authority under the New York Convention (and FAA) is limited to deciding whether the foreign arbitral award should be recognized and enforced (i.e., confirmed) in the United States or refused. *See Salini Costruttori S.p.A. v. Kingdom of Morocco*, 233 F. Supp. 3d 190, 197 (D.D.C. 2017) ("Secondary jurisdictions may refuse to enforce an award, but these decisions do not preclude other jurisdictions from enforcing it. By contrast, only a primary jurisdiction may set aside an award.").

In considering whether to confirm or refuse an arbitral award, "the standard of review of arbitral awards is among the narrowest known to law." *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000) (quoting *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1462 (10th Cir. 1995)). The Court must afford "'maximum deference' to the arbitrators' decisions." *CEEG (Shanghai) Solar Sci. & Tech. Co., Ltd v. LUMOS LLC*, 829 F.3d 1201, 1206 (10th Cir. 2016) (citing *ARW Exploration*, 45 F.3d at 1462); *see also Brown*, 220 F.3d at 1182 ("we must give extreme deference to the determination of the arbitration panel"). The Court is "not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract," *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987), and "[a]n arbitrator's erroneous interpretations or applications of law are not

reversible," *ARW Exploration*, 45 F.3d at 1463. "'Errors in the arbitrator's interpretation of law or findings of fact do not merit reversal' of the award unless the arbitrator's decision is based on '"manifest disregard of the law."'" *Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V.*, 994 F.3d 1181, 1186 (10th Cir. 2021) (quoting *Bowles Fin. Grp., Inc. v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1012 (10th Cir. 1994)). "A court may not, therefore, independently judge an arbitration award." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir. 2001). Federal courts "employ this limited standard of review and exercise caution in setting aside arbitration awards because one purpose behind arbitration agreements is to avoid the expense and delay of court proceedings." *Id.* "By agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Brown*, 220 F.3d at 1182 (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31 (1991)).

"Under the New York Convention, a court must 'confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'" *CEEG (Shanghai) Solar Sci.*, 829 F.3d at 1206 (quoting 9 U.S.C. § 207). The reasons for refusal relevant to Eruption's arguments are:

> 1.     Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>> (a)     The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

> (b)    The party against whom the award is invoked was not given
> proper notice of the appointment of the arbitrator or of the arbitration
> proceedings or was otherwise unable to present his case; or
>        . . .
> 2.      Recognition and enforcement of an arbitral award may also be refused
> if the competent authority in the country where recognition and enforcement
> is sought finds that:
>        . . .
> (b)    The recognition or enforcement of the award would be contrary
> to the public policy of that country.

New York Convention, 21 U.S.T. 2517, art. V(1)-(2).  The defenses specified in the New

York Convention constitute the exclusive bases for refusing to confirm a foreign arbitral

award.  *Goldgroup Res.*, 994 F.3d at 1188.

"Courts construe these defenses 'narrowly, to encourage the recognition and

enforcement of commercial arbitration agreements in international contracts.'"  *CEEG*

*(Shanghai) Solar Sci.*, 829 F.3d at 1206 (quoting *Karaha Bodas Co. v. Perusahaan*, 364

F.3d 274, 288 (5th Cir. 2004)).  "A confirmation action under the New York Convention

'is a summary proceeding in nature, which is not intended to involve complex factual

determinations, other than a determination of the limited statutory conditions for

confirmation or grounds for refusal to confirm."  *Compania de Inversiones Mercantiles,*

*S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1287 (10th Cir.

2020) (quoting *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)), *cert. denied*, 141 S.

Ct. 2793 (2021).  The party challenging the enforceability of an arbitral award, as Eruption

does here, "has the burden of sustaining such an attack."  *Ormsbee Dev. Co. v. Grace,* 668

F.2d 1140, 1147 (10th Cir. 1982).  And that "burden is a heavy one, as 'the showing

required to avoid summary confirmance is high,'"  *Guang Dong Light Headgear Factory*

*Co. v. ACI Int'l, Inc.*, 521 F. Supp. 2d 1153, 1166 (D. Kan. 2007) (quoting *Encyclopaedia*

*Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005)).  The

party challenging confirmation must make "a convincing showing" that one of the "narrow

exceptions" applies to avoid confirmation and enforcement.  *Matter of Arb. Between Trans*

*Chem. Ltd. & China Nat. Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 309 (S.D. Tex.

1997), *aff'd sub nom. Trans Chem. Ltd. v. China Nat. Mach. Imp. & Exp. Corp.*, 161 F.3d

314 (5th Cir. 1998).

## DISCUSSION

The Court finds Eruption has not carried its burden of showing one of the exceptions

to confirmation applies in this case.  In its Order Granting Petitioner's Motion to Conduct

Limited Discovery, the Court cursorily discussed several of the deficiencies it found in

Eruption's motion to set aside or refuse the arbitral award.  (Doc. 21 pp. 8-10.)  Eruption's

subsequent reply (Doc. 33) has not adequately supported its assertions or rectified those

deficiencies.

### 1.    Article V(1)(a) - Validity of the Sales Contracts

Eruption first contends "there was no legal relationship, contractual or otherwise,

between the parties" because Francis Liang fraudulently entered into the sales contracts

without authority to do so.  (Doc. 12 p. 14.)  Eruption argues it was never a party to the

sales contracts and should not be held to answer on them.  "Here, undoubtedly someone

agreed to Weihai's contracts (we now know that to be Mr. Liang), but it was not Eruption.

Eruption has never engaged or sought the services of Petitioner (or any Chinese company

for that matter)."  (*Id.* p. 16.)  Obviously due to Eruption's non-participation in the

arbitration proceeding, this argument was never presented to the arbitrator. In response, Weihai asserts Eruption is liable on the sales contracts because Francis Liang had actual or apparent authority to bind Eruption to the contracts. (Doc. 32 p. 10-16.)

Under Article V(1)(a), the Court may refuse to confirm a foreign arbitral award if "the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made." The parties disagree about what law applies to this issue. Weihai says Chinese law governs the validity of the agreement because each sales contract included a choice-of-law provision denoting that contractual disputes would be governed by the laws of China. (Doc. 32 p. 17; *see, e.g.*, Doc. 1 p. 84.) Eruption contends the validity of contracts is "a matter that has been routinely decided using principles of domestic law." (Doc. 33 p. 9.) The plain language of Article V(1)(a) suggests Chinese law would govern this dispute, but the Court will apply domestic contract principles to this issue because the very core of Eruption's argument is that it is not a party to the sales contracts and therefore Eruption never agreed to subject the contracts to Chinese law. *See Changzhou AMEC E. Tools & Equip. Co. v. E. Tools & Equip., Inc.*, No. EDCV 11-00354 V, 2012 WL 3106620, at *9-19 (C.D. Cal. July 30, 2012) (applying domestic contract law in determining validity of underlying contract in a foreign arbitral award confirmation proceeding), *aff'd sub nom. Xuchu Dai v. E. Tools & Equip., Inc.*, 571 F. App'x 609 (9th Cir. 2014) (noting, though, that the parties did not challenge on appeal whether common law duress could "constitute a defense against confirmation of an arbitration award under the New York convention").

Even applying United States contract principles, though, the Court finds Eruption has not carried its burden on this issue.

### 1.1    Francis Liang's Apparent Authority to Enter into the Sales Contracts

Francis Liang had the apparent authority, created by Mr. Legge's actions on Eruption's behalf, to bind Eruption to the sales contracts. "Apparent authority is created when the principal holds the agent out as possessing the authority to bind the principal or when the principal allows the agent to claim such authority." *Miller v. Life Care Centers of Am., Inc.*, 478 P.3d 164, 173 (Wyo. 2020) (quoting *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 62 (Wyo. 1995)). "To bind the principal under a theory of apparent authority, a third party must establish personal knowledge of, and reliance on, the apparent authority of the agent." *Id.* (citing *Ulen v. Knecttle*, 58 P.2d 446, 449 (Wyo. 1936)).

> To recover on [an apparent authority theory] the third party must establish two facts: (1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent.

*Id.* at 173–74 (alteration in original) (quoting *Cargill*, 891 P.2d at 62-63).

Mr. Legge provided Francis Liang with an email address at Eruption's business domain (francis@eruptioninc.com) (Doc. 19-1 (Legge Aff.) ¶ 2), which Francis Liang used to communicate with Weihai (*e.g.*, Doc. 32-2 pp. 1-4). Mr. Legge says he "intended for this gesture to assist with communications regarding Eruption's order with the Feimann Group in March of 2018" (Doc. 19-1 ¶ 3) and did it "because [he] didn't want to get any kind of [computer] viruses coming into [his email] system" (Legge Depo. 14:21-15:13[1]).

---

[1] Available at Doc. 32-3.

Mr. Legge's affirmative action strongly suggests to Weihai that Francis Liang was an employee or representative of Eruption.

Additionally, as mentioned earlier, Eruption wired $300.00 from its own account to Weihai at the request of Francis Liang.  (Doc. 12-1 p. 62.)  Eruption complied because "[t]he request seemed innocent enough" and Mr. Legge was "[l]ooking forward to assisting a perceived partner in need" (*id.* p. 5), and Francis Liang was trying to become Mr. Legge's personal friend (Legge Depo. 25:8-27:16).  This money wire occurred in late August 2018 (Doc. 12-1 p. 62), after Francis Liang had placed the first order with Weihai allegedly on Eruption's behalf (Doc. 1 p. 26, Doc. 17-1 pp. 13-15).  Again, Mr. Legge's affirmative action reasonably suggests to Weihai that Francis Liang had the authority to bind Eruption to the sales contracts and that Eruption intended to pay for the garments.[2]

Finally, Mr. Legge was copied on at least two of the emails between Francis Liang and Weihai.   (Doc. 32-2 pp. 1-4 (email from Elain Yang at Weihai to francis@eruptioninc.com copied to john@eruptioninc.com, and response email from francis@eruptioninc.com also copied to john@eruptioninc.com).)  These emails, printed from John Legge's @eruptioninc.com email account and dated December 27, 2018[3], were in English and warned that while Weihai had accepted a partial payment from Feimann Group on Eruption's behalf, future payments needed to come directly from Eruption.  (*Id.*)

---

[2]  This $300 payment was credited against the first sales contract, and with the later payment received from Francis Liang/Feimann Group, the first sales contract was paid in full and the small remainder was credited against the second sales contract.

[3]  The same emails are found elsewhere in the record with a date of December 28, 2018.  (Doc. 17-1 p. 37.) The other version contains more Mandarin writing and appears to be printed from Weihai's email account, which would correspond with China's time zone being at least 13 hours ahead of the U.S. time zones.

In Francis Liang's response to Weihai, he said he had "discussed with John already" and confirmed that future payments would be made "thru Eruption bank account." (*Id.*) Despite being copied on these emails and testifying that he checked his Eruption email account (Legge Depo. 23:6-10), Mr. Legge asserts he did not see these emails (Legge Depo. 23:13-21) and "did not afford this message any attention as neither I nor Eruption had dealings in China or with a China-based provider" (Doc. 19-1 (Legge Aff.) ¶ 8), despite having earlier wired $300 to Weihai. While the Court finds Mr. Legge's responses on this matter to be contradictory[4], what matters more is that Mr. Legge was copied on an email that said he had discussed the payment situation with Francis Liang and Mr. Legge never objected to the assertion or corrected the matter he now says was fraudulent.

By assigning Francis Liang an @eruptioninc.com email address and wiring $300 to Weihai at Francis Liang's request, Mr. Legge/Eruption created an appearance of authority in Francis Liang to act on behalf of Eruption. Then, by failing to respond to the email exchange asserting that future payments for six sales contracts would come directly from Eruption's bank account, Eruption allowed Weihai to reasonably rely on Francis Liang's actions and representations as an agent of Eruption. The two elements necessary for apparent authority exist in this case, and Francis Liang possessed apparent authority to bind

---

[4] This is not the only contradiction from Mr. Legge. In his affidavit in support of Eruption's motion to set aside or refuse the arbitral award, Mr. Legge asserted, "I am entirely unfamiliar with" Mr. Yun (York) Liu (Doc. 12-1 (Legge Aff.) ¶ 51). In his later deposition, though, Mr. Legge said he had met Mr. Liu once in person at Francis Liang's office but did not speak with him because Mr. Liu did not speak English. (Legge Depo. 38:1-39:1.)

Eruption to the sales contracts, which effectively makes Eruption a party to the sales contracts.[5]

### 1.2   Eruption's Implied Ratification and Francis Liang's Actual Authority

Even if Francis Liang did not possess apparent authority to bind Eruption to the sales contracts, Eruption, through Mr. Legge, impliedly ratified the sales contracts entered into by Francis Liang as Eruption's alleged agent.  An act that was unauthorized when done, as Eruption contends here, "may be expressly or impliedly ratified and thus be rendered just as binding as if it had been authorized when done." *Lahnston v. Second Chance Ranch Co.*, 968 P.2d 32, 36 (Wyo. 1998).  One of the methods for impliedly ratifying a previously unauthorized act is "silence, acquiescence, or failure to repudiate." *Id.* As previously discussed, Mr. Legge was copied on at least two emails between Francis Liang and Weihai.   (Doc. 32-2 pp. 1-4 (email from Elain Yang at Weihai to francis@eruptioninc.com copied to john@eruptioninc.com, and response email from francis@eruptioninc.com also copied to john@eruptioninc.com).)  These emails indicate they were received by John Legge on December 27, 2018, and they were in English and warned that while Weihai had accepted a partial payment from Feimann Group on Eruption's behalf, future payments needed to come directly from Eruption.  (*Id.*)  In Francis

---

[5]  On December 13, 2018, Francis Liang emailed to Weihai a letter, purportedly signed by Mr. Legge on Eruption's letterhead, which authorized Francis Liang and Feimann Group to act on Eruption's behalf concerning apparel business dealings in China.  (Doc. 17-1 pp. 24-25.)  Eruption contends this was a fraudulent letter and filed a report from an expert document examiner opining that the signature on the authorization letter does not match Mr. Legge's handwriting.  (Doc. 12-1 pp. 80-95.)  From Weihai's perspective, there certainly was nothing at the time to suggest the authorization letter was forged, thus only increasing the appearance of Francis Liang's authority to bind Eruption on the sales contracts.  However, the Court does not find it necessary to determine here the authenticity of the authorization letter because the Court has not considered the authorization letter as part of the analysis.

Liang's response to Weihai, he said he had "discussed with John already" and confirmed that future payments would be made "thru Eruption bank account." (*Id.*) Mr. Legge asserts, "Unfortunately, I did not afford this message any attention as neither I nor Eruption had dealings in China or with a China-based provider" (Doc. 19-1 (Legge Aff.) ¶ 8), again despite having earlier wired $300 to Weihai in an alleged attempt to support Francis Liang's dealings in China with a China-based provider.

Mr. Legge's explanation raises the issue of Eruption's knowledge of the matter, which is necessary for ratification. "Ratification requires full knowledge of all the material facts on the part of the corporate principal." *Lahnston*, 968 P.2d at 36. Giving Mr. Legge and Eruption the benefit of the doubt, it appears they did not have complete knowledge of all the material facts surrounding the contract sales at the time he was copied on these emails. But the emails created a duty to inquire. "Although actual knowledge of the act is required, directors are held to know that which they could have ascertained with slight diligence. A director is chargeable with knowledge of those corporate affairs which it is his duty to know." *Id.* (internal citation omitted). The email from Weihai demanded that future payments for the remaining six purchase orders come from Eruption and not another company's account, and it noted the products for two of the purchase orders were being shipped at that time. (Doc. 32-2 p. 1.) And Francis Liang responded, "We will make the payment thru Eruption bank account for any outstanding balance in the future." (*Id.* p. 3.) Having given Francis Liang an Eruption email account and previously wired money to Weihai from Eruption's account, some slight diligence by Mr. Legge and Eruption looking into the emails on which he was copied at this point would have revealed the sales contracts

and the alleged fraud of Francis Liang.  Consequently, the law charges Mr. Legge/Eruption with possessing this knowledge.

Moreover, Mr. (and Mrs.) Legge had prior business experience placing and obtaining large orders of clothing from a Chinese manufacturer.  *See Grooms v. Legge*, No. 09CV489-IEG-POR, 2009 WL 962067, at *4 (S.D. Cal. Apr. 8, 2009) (describing an order "for more than $200,000 of sweatshirts imported from China" placed by the Legges for one of their prior business ventures).  Thus, due to his experience with placing large textile orders with Chinese manufacturers, Mr. Legge was not a neophyte and was in a position to recognize and understand the significance of the December 27, 2018 emails.

Mr. Legge had a duty to inquire into the information and a duty to speak against Francis Liang's actions if he did not agree with them.  "Where the rights and obligations of third parties [such as Weihai here] may depend on his election to ratify or disaffirm, a party is bound to act, or suffer the consequences of inaction; and if, after knowledge, he remains entirely silent and impassive, it is but just, when the protection of third parties require it, to presume that what, upon knowledge, he has failed to repudiate, he has tacitly ratified."  *McConnell v. Dixon*, 233 P.2d 877, 892 (Wyo. 1951).

Because Mr. Legge and Eruption are charged with knowing of the sales contracts as of December 27, 2018, their silence and failure to repudiate the actions of Francis Liang constitute implied ratification.  *See Velasquez v. Chamberlain*, 209 P.3d 888, 894 (Wyo. 2009) ("In this case, ratification is implied by Guy's silence in the face of knowledge of the pipeline….  It also can be reasonably inferred that, by not objecting to Larry in any manner over a period of almost six months, Guy ratified the Agreement.").  Mr. Legge's

lack of action after receiving the December 27, 2018 emails "justifies a reasonable assumption" that Eruption consented to Francis Liang's actions allegedly taken on Eruption's behalf. *Id.* (quoting Restatement (Third) of Agency (ALI) § 4.01 (2006)). In turn, ratification "retroactively creates the effects of actual authority." *Id.* (quoting Restatement (Third) of Agency (ALI) § 4.02 (2006)). Accordingly, Francis Liang possessed actual authority to bind Eruption to the sales contracts, which makes Eruption a party to the sales contracts.

Eruption has not carried its burden under Article V(1)(a) of the New York Convention of showing the sales contracts were invalid against Eruption. Through apparent authority or implied ratification, or both, Eruption's actions made it a party to, and liable on, the sales contracts at issue in the arbitral award.

## 2.      Article V(1)(b) - Notice of Arbitration Proceedings

Eruption also argues it never received proper notice of the arbitration proceeding. (Doc. 12 pp. 18-21.) Under Article V(1)(b), a foreign arbitral award may be refused if "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case."

> To judge compliance with the New York Convention's "proper notice" requirement, courts look to the forum's standards of due process. *See Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

*CEEG (Shanghai) Solar Sci. & Tech. Co., Ltd v. LUMOS LLC*, 829 F.3d 1201, 1206 (10th Cir. 2016) (footnote omitted).

The arbitral award states the arbitrator sent three separate documents via express mail service to Eruption, and delivery of each was confirmed:

| Document(s) | Date Mailed | Date Delivered |
|---|---|---|
| Arbitration notice, with copy of arbitration rules | May 6, 2020 | "It has been confirmed that the said mail sent to the Respondent was delivered on July 14, 2020." (Doc. 1 p. 18.) |
| Notice of arbitration hearing set for November 11, 2020 | September 24, 2020 | "It has been confirmed that the said documents sent to the Respondent were delivered on September 30, 2020." (Doc. 1 p. 18.) |
| Documents submitted by Claimant Weihai for arbitration hearing, and request for objections | November 30, 2020 | "It has been confirmed that the above mail sent to the Respondent was delivered on December 7, 2020." (Doc. 1 p. 19.) |

Additionally, the arbitral award itself was mailed via express mail service to Eruption's business address, which is also its registered agent's address (Doc. 12 p. 9), on January 15, 2021, and the International Express Waybill reports it was delivered on January 22, 2021, at 11:08 a.m. (Doc. 1 pp. 64-66, 72; *see also* Doc. 12-1 p. 65 (Eruption's letterhead showing the same address to which the arbitral award was sent).)

In support of Eruption's claim that it never received any mail from the arbitrator, it provides its own internet tracking search results for the arbitral award. (Doc. 12-1 pp. 103-104.) These tracking inquiries appear to show only that the parcel left the Beijing International Airport on January 19, 2021, and they do not display any record of the parcel's whereabouts after that. (*Id.*) While this tracking information does not indicate delivery, it also does not rebut the arbitrator's records showing the parcel was delivered

three days later (Doc. 1 pp. 65, 66, 72). Ignoring the severe foundational shortcomings of this evidence for the moment, this incomplete tracking information does not carry Eruption's burden of rebutting the arbitrator's statements that notice of the arbitration proceeding and hearing were confirmed delivered to Eruption's business address, which was its registered agent's address.

Eruption also submits a copy of an email exchange between Mr. Legge and Wyoming EZ Corp, Eruption's registered agent. (Doc. 12-1 p. 101.) In it, he asked the registered agent whether it had received "any legal papers or any other correspondence" on the dates on which the arbitrator's mail was confirmed delivered (according to the arbitrator), and the registered agent responded that it had "not received anything for you on these dates." (*Id.*) However, this out-of-court and unsworn statement is classic hearsay for which Eruption offers no guaranties of trustworthiness, and the Court will not rely on it for the truth of the matter asserted therein. It carries no probative value in support of Eruption's assertions. *See Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (in motions practice, evidence need not be produced in a form that would be admissible at trial, but "the content or substance of the evidence must be admissible" at trial).

In the end, though, even were the Court to consider both the foundationless tracking information and hearsay email and accept Eruption's claim that it did not receive actual notice, it still would not carry Eruption's burden of proving lack of notice under the New York Convention. As already noted, proper notice under Article V(1)(b) must be reasonably calculated under the circumstances to fairly apprise the parties of the action and

hearing. "Successful actual notice is not required; the adverse party need only prove an attempt to provide actual notice." *Guarino v. Productos Roche S.A.*, 839 F. App'x 334, 340 (11th Cir. 2020); *see Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 297 (S.D.N.Y. 2013) ("Due process does not require perfect or actual notice."). "The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (internal citations omitted). Here, the multiple mailings to Eruption from the arbitrator, all via express mail service with delivery confirmation, were reasonably calculated under the circumstances to fairly apprise Eruption of the arbitration proceeding and to provide a reasonable time and opportunity for Eruption to defend itself and present its objections. Absent convincing evidence to the contrary, which has not been presented in this case, the Court defers to the arbitrator's statements in the arbitral award of having mailed multiple notices to Eruption and confirmed their delivery. (Doc. 1 pp. 18-19.) Eruption has not carried its burden under Article V(1)(b) of the New York Convention of showing lack of proper notice.

**3.       Article V(2)(b) - Contrary to the Public Policy of the United States**

Eruption lastly argues that equity, justice, and public policy demand the Court refuse the arbitral award. (Doc. 12 pp. 21-23.) Article V(2)(b) of the New York Convention allows a court to refuse an arbitral award where "recognition or enforcement of the award would be contrary to the public policy of that country." The against-public-policy defense "is to be 'construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice.'" *Asignacion v. Rickmers Genoa*

*Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1016 (5th Cir. 2015) (quoting *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 851 n.2 (6th Cir. 1996)). "[T]he defense is frequently invoked but rarely successful, particularly in view of the strong United States policy favoring arbitration." *Agility Pub. Warehousing Co. K.S.C., Pro. Cont. Administrators v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012) (citing *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009), and *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1097 (9th Cir. 2011)). The Second Circuit noted the against-public-policy defense is "tightly restricted" and "applies only where enforcement of the arbitration award, as opposed to enforcement of the underlying contract, would violate public policy." *Yukos Cap. S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 8, 11 (2d Cir. 2014).

As the Court already determined that Eruption was lawfully bound as a party to the sales contracts due to Liang Francis' apparent and/or actual authority, and Eruption has not proven a lack of proper notice of the arbitration proceeding, the Court cannot say enforcing the arbitral award would be against United States law or policy. Indeed, under these circumstances, refusing to confirm the award would more likely "violate our most basic notions of morality and justice." *Telenor Mobile Commc'ns*, 584 F.3d at 411.

Eruption asserts, "The general rule for this matter is simple - the law should not aid in the carrying out of a fraud." (Doc. 12 p. 22.) The premise of Eruption's argument is not supported. Even assuming Francis Liang committed the fraud alleged by Eruption, which this Court does not here find, Weihai is the party seeking to confirm the arbitral award, and Eruption has not shown Weihai committed any fraud. Eruption has not carried its burden

of proving that confirming the arbitration award in this case constitutes condoning or enforcing a fraud.  The Court does not find the arbitral award should be refused under Article V(2)(b) of the New York Convention as against the public policy of the United States.

## CONCLUSION AND ORDER

Under the New York Convention and applicable caselaw, the Court starts from the position that an arbitral award is valid and should be confirmed and enforced.  Eruption has not carried its burden of proving the arbitral award in this case should be refused in the United States under one of the exceptions allowed under the New York Convention.

**IT IS THEREFORE ORDERED** that Respondent Eruption Holdings, Inc.'s Motion to Set Aside or Refuse Arbitral Award (Doc. 11) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner Weihai Textile Group Import & Export Co., Ltd.'s Petition to Confirm an International Arbitral Award (Doc. 1) is **GRANTED**.  The China International Economic and Trade Arbitration Commission (CIETAC) Arbitral Award, dated January 15, 2021, is hereby **CONFIRMED** under the New York Convention.

**IT IS FURTHER ORDERED** that the Clerk of Court will please enter judgment in favor of Petitioner and against Respondent in the amount of $566,937.10, plus all fees, costs, and interest ordered in the January 15, 2021 CIETAC Arbitral Award.

**DATED**: March ___4ᵗʰ___, 2022.

Scott W. Skavdahl
United States District Court Judge